IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 17, 2019

**STATE OF TENNESSEE v. MICHAEL RAY HOWSER**

**Appeal from the Criminal Court for Sumner County**
**No. 2017-CR-502   Dee David Gay, Judge**

_____

**No. M2018-00603-CCA-R3-CD**

_____

Defendant, Michael Ray Howser, pled guilty to aggravated assault, reckless endangerment with a deadly weapon, and possession of a weapon by a convicted felon with an agreed effective sentence of ten years as a Range II multiple offender with the trial court to determine the manner of service. A sentencing hearing was held, and the trial court ordered Defendant's ten-year sentence to be served in confinement. On appeal, Defendant argues that the trial court erred by denying alternative sentencing. After a careful review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

John D. Pellegrin, Gallatin, Tennessee, for the appellant, Michael Ray Howser.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Katherine Brown Walker, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

The affidavit of complaint in this case contains the following description of events:

> On 5-14-2017 at approximately 2259hrs I, Deputy M. Rice, was dispatched to the Sheriff's Office to take a report for a domestic assault that occurred earlier in the evening. Upon arrival I spoke to Taffie

Howser. Taffie stated that her husband, [Defendant] (a convicted felon), came home angry at her and accused her of lying to him and started consuming alcohol. Taffie was in the yard with [Defendant's] juvenile son when [Defendant] came outside with a .380 caliber handgun walked over to her asked her to "uncock the gun." [Defendant] then fired the pistol into the air next to her head and took her keys to prevent her from leaving the house. [Defendant] proceeded to lay the pistol on a tractor and sat down by the tractor. [Defendant] consumed more alcohol picked up the pistol unloaded it and took the pistol inside the house. [Defendant] came back outside told his juvenile son to go in the house. [Defendant] and Taffie remained outside where the argument continued. [Defendant] stated he would never hurt her but she had to stop lying to him. Taffie denied lying, [Defendant] insisted she was lying. [Defendant] told Taffie to go in the house, she complied. [Defendant] left the house for a short time and returned while the juvenile was eating supper. [Defendant] told Taffie to sit and eat with the juvenile. Taffie stated she wasn't hungry; [Defendant] said "I said sit down and eat." Taffie sat next to the juvenile. [Defendant] said again "I said eat," grabbed a rib bone off a plate, grabbed Taffie by the hair on the back of her head and tried to force feed her the rib bone and said, "Eat or I'll shove this bone down your throat." Taffie separated from [Defendant] and fled the living room. Taffie returned to the table and sat down again. [Defendant] walked out of the front door, Taffie grabbed her phone and left the house by the back door.

*Sentencing Hearing*

**State's Proof**

Initially, we note that Taffie Howser's testimony at the sentencing hearing differed in several ways from her statement that she made to police at the time of the offenses. Her written statement to police with appropriate edits indicated in brackets, and with lines through words that Mrs. Howser marked out on the statement, is as follows:

[Defendant] has continued for several months of being controlling, [mental] abuse, threats and his rage/anger has escalated until this last week. [Defendant] wants to know where I am every minute requesting pictures of my time clock while working. Last week while visiting his dad in the hospital he kept sending text messages and his rage/anger increased. He told me to leave and get away from his family. He sent texts stating "I can't stand you, I hate you, F[- -]cking lying b[- -]ch." I was scared to go home and called my dad for help. [Defendant] convinced me to return home after meeting with my dad. Once I arrived

home, [Defendant] stated to never tell my parents anything that ever happens between us again. He made me call my dad and have it on speaker phone telling him (my dad) that I was a liar and he was in charge of the household. All this week [Defendant] has continued to change his behavior back and forth and telling me I am a fake Christian, and he hates a liar. Today [Defendant] came to my work and continued to argue with me stating I was a liar and our marriage was not worth saving because I continued with lies. Tonight once we arrived home [Defendant] came home with alcohol and his anger increased. [J.H.] and I was playing ball after [Defendant] and [J.H.] played and he brought the [.]380 outside he came over to me and said uncock this gun. I said what? and was looking at it and he shot it ~~right~~ up in the air ~~by my~~ and said never mind. Then he sat down and laid it on the tractor step beside where he was sitting. He also took my keys so I couldn't go anywhere. He continued with remarks about me and he would increase in anger [sic] then be calm. He went and picked up the gun after drinking another beer and [J.H.] and I continued to play ball. By the back porch before walking into the house he unloaded the clip of the gun. Then he came back out and told [J.H.] to come inside. [J.H.] went in then [Defendant] started to talk to me calmly again stating he wasn't going to hurt me. He moved closer and I backed away. He said again he wasn't going to hurt me because I was still his delicate flower. He continued to ask me to tell him the truth because "I was still lying" and he knew I was lying. ~~He~~ I told him again and he said I was still lying and we will live a marriage of where he will do what he wants and I will continue to live in a lie. He told me to get in the house and he gave me a chance to come clean and I still continued to lie. He left in the Yukon. I got [J.H.] supper and he was sitting at the table eating. [Defendant] came in the front door and said sit down and eat with him. I told him I didn't want to eat that I wasn't hungry and he yelled saying "I said sit down and eat." I sat down in the chair beside [J.H.]. He went over to the plate of ribs and said I said EAT! He came over and grabbed the back of my hair and tried to shove the bone/rib in my mouth. He said I said eat or I will shove this bone down your throat. [J.H.] began to cry and telling him to stop. I was pushing it away the rib [sic] and trying to get away from him and the chair fell. I moved around the living room ~~automan~~ coffee table to keep him away then came back to the kitchen and picked up the chair and sat back down [sic] he said from now on you are going to be my slave. Then [J.H.] said to him stop again and [Defendant] went out the front door. I ~~kissed~~ told [J.H.] I loved him grabbed my phone and ran out the back. This is not the first time [Defendant] has been physical with me. Another time [J.H.] and I came home and while helping [J.H.] get out of the vehicle [Defendant] punched me in the face. I was late

- 3 -

coming home because I was stopped by the train in Mitchellville which outraged [Defendant]. [Defendant] continues to blame me for his actions. I made him act this way.

Taffie Howser testified that she and Defendant have been married for two years, and they are raising Defendant's now ten-year-old son, J.H., together. As the result of an incident on May 14, 2017, there was an order of protection put into place by the arresting officer, and she asked the court to remove it shortly thereafter. She and Defendant currently live together and have lived together since the no contact order was amended to no violent contact.

Mrs. Howser testified that on May 14, 2017, she was outside playing baseball with Defendant and J.H. At some point, Defendant sat down by the tractor, and he later walked inside the house. Mrs. Howser testified that Defendant walked back outside carrying her handgun. She said, "He handed it to me and asked if the gun was uncocked - - or unlocked and I looked at it. I said, I don't know. Then I handed it back to him." Mrs. Howser testified that Defendant turned the gun to the right and fired it "towards our field towards the ground." Mrs. Howser testified that she "was over, like, to the other side of him, and, like, when he turned I was already over to the left." J.H. was standing further away toward the house. She said that Defendant did not say anything when he fired the weapon.

Mrs. Howser testified that Defendant sat back down beside the tractor, and she and J.H. continued playing baseball. She said that Defendant then got up and walked toward the back of the porch and "stood up at the back door and fired the weapon up in the air." Again, Defendant did not say anything. Mrs. Howser testified that neither she nor J.H. had any reaction to Defendant discharging the weapon because they were accustomed to being around guns. She also said that she did not think about leaving at that time and that "if I thought anything, you know, safety measures or [J.H.] and I was in danger, you know, I would have done whatever I needed to do." Mrs. Howser agreed that Defendant took her keys when he went inside the house the first time. However, she did not feel that she could not leave the property. Mrs. Howser agreed that in her written statement to police she wrote, "He also took my keys so I couldn't go anywhere." Mrs. Howser explained her statement as follows: "On the - - on the - - at the time when we were - - when the gun incident - - you know, if I needed to leave or - - and all that stuff, I could have left. But when I stated that in the report, that was when he got my keys is how I felt at that time." Mrs. Howser also said that she and Defendant took each other's keys all the time. Mrs. Howser testified that Defendant brought her keys back outside when he walked out with the gun, and he placed them beside the tractor. She thought that Defendant had been drinking beer. Mrs. Howser could not recall if Defendant said anything while he was sitting on the tractor beside her keys. She testified that he was "just sitting there." She eventually agreed that Defendant said something about her. Mrs. Howser said that she also wrote in the statement to police that Defendant, "Shot it right

- 4 -

up in the air by my [sic]." She then crossed out the words "right" and "by my [sic]." She did not know why she crossed out the words.

Mrs. Howser testified that J.H. eventually went inside the house for supper. She and Defendant remained outside arguing while she picked things up. Mrs. Howser did not remember what Defendant said to her. After reading her statement to police, Mrs. Howser testified that she and Defendant had been in an argument earlier that morning and that the argument had paused while she and Defendant were outside with [J.H.]. She noted that Defendant had accused her the previous day of lying about her past. Mrs. Howser agreed that Defendant called her "delicate flower" after he fired the gun, which was her nickname. She admitted that she backed away from Defendant because he told her that he was not going to hurt her. At that point, Mrs. Howser stated that she knew that the gun was inside the house.

Mrs. Howser could not recall if Defendant told her to go inside for supper but she agreed that it was in her statement to police. She also agreed that Defendant said that "he would do whatever he wanted to do," but he was not referring to their relationship. Mrs. Howser initially could not recall if Defendant said anything else to her when he told her to get inside the house. However, she eventually admitted that Defendant said that he would give her a chance to "come clean" and that she "still continued to lie." Mrs. Howser testified that when she told Defendant that she was not hungry, he picked up a "rib bone and he puts it to my lips and he says, [']You're going to eat or I'm going to shove it down your throat.[']" Defendant had the other hand on the back of her hair. Mrs. Howser testified that Defendant was upset at that point, and he was yelling. She moved to get away from him, knocking the chair over, and Defendant followed her. Mrs. Howser eventually sat down in a chair at the dining room table, and Defendant walked out the front door. She then took her cell phone and went out the back door to a neighbor's house to "get away from the situation." Mrs. Howser called her father, George Wallace, who came and picked her up. They drove to the sheriff's office and filed a report. She said, "I didn't know all this would happen. I just wanted to make a report for a divorce in case I wanted one." Mrs. Howser noted that she and Defendant had several previous arguments but that was the first time that he threatened her. She had never been injured during any of their previous fights. She sometimes stayed at her parents' home after she and Defendant argued. Mrs. Howser agreed that Defendant's rage and anger had escalated up until the incident in May 2017.

Mrs. Howser testified that Defendant knew everything about her daily routine because "[w]e tell each other what we're doing." She did not recall how often he contacted her each day. She said, "We would call and text back and forth all the time." Mrs. Howser worked as a home health nurse, and Defendant often had her make photographs of her time sheets with her cell phone and send them to him. She agreed that Defendant wanted to know her whereabouts "[a]ll the time." Mrs. Howser could not recall if Defendant contacted her while she was visiting his father in the hospital. She

then read from her statement to police concerning the incident and stated that what she said in the statement was true. We note that at that point in the sentencing hearing, Mrs. Howser asked to go to the restroom. A brief recess was held, and when court resumed the following exchange took place:

[Prosecutor]: Mrs. Howser, while we were on break did [Defendant] talk to you?
[Mrs. Howser]: We gave each other a hug, yes.
[Prosecutor]: Did he say anything to you about your testimony?
[Mrs. Howser]: We - - no. We were - - hugging each other, told each other we loved each other.

Mrs. Howser testified that she was afraid to go back home after Defendant contacted her when she visited his father because "I didn't know what would - - I mean, if we were still arguing or what would happen or whatever." She then called her father for help. Mrs. Howser testified that she went back home, and Defendant told her that they should keep their "business" between themselves and not tell her parents. Mrs. Howser said that Defendant may have also had her call her father on speakerphone but she could not recall what he told her to say to her father. Mrs. Howser then read from her statement to police and said that Defendant told her to tell her father that she was a liar and a "fake Christian." Defendant also told her to say "[t]hat we'll be keeping everything, you know, in our marriage between us." Mrs. Howser testified that Defendant hit her in the jaw during one of their previous arguments.

On cross-examination, Mrs. Howser testified that she reported the incident in the present case for the purpose of filing for divorce. She would not have reported the incident if she had thought Defendant would be arrested or go to prison. Mrs. Howser testified that she had tried to get the charges against Defendant dismissed. She admitted that it would be a financial hardship, and they would lose everything if Defendant was incarcerated.

Mrs. Howser testified that Defendant was involved in drug court when they began dating. She said that he took drug court seriously, and he was not drinking or using drugs during that time. Mrs. Howser agreed that Defendant was jealous and insecure. However, she said that he had gotten much better since the latest incident. Mrs. Howser testified that Defendant worked as a butcher for Cash Saver and that he had worked as a butcher for more than twenty years. She said that Defendant was drinking at the time of the incident in the present case but that it was an isolated event. She also did not think that he had been drinking any since the event. Mrs. Howser testified that Defendant is back in a recovery program, and she attends meetings with him. He also has a sponsor named Eric, and he has received counseling through their church. Mrs. Howser testified that she has not seen any evidence of drug or alcohol abuse since this incident.

Mrs. Howser testified that she and Defendant previously attended church in Lebanon where her father is the pastor. She said that they now attend church in Bowling Green, Kentucky where Defendant's brother-in-law is the pastor. Mrs. Howser testified that she and Defendant attend every church service with J.H. unless Defendant has to work, and she takes J.H. to church when Defendant is working. Mrs. Howser testified that Defendant has shown remorse since this incident, and he apologized to her on several occasions. She also said that Defendant was a good father who spends a lot of time with J.H. Mrs. Howser testified that the four guns in the house belonged to her, and they are no longer there.

The trial court asked Mrs. Howser about what happened when Defendant hit her in the jaw. She testified:

> I was late that night from working. I had picked up [J.H.] from day care and I was on my way back from work and I pulled in the driveway. I was stopped by a train. And pulled in the driveway and I was getting my stuff out of the back and he came to the right and hit me in the jaw.

Mrs. Howser testified that Defendant hit her with his fist. Defendant was under the influence of alcohol at the time. Mrs. Howser told the trial court that Defendant had changed since this incident.

George Wallace, Mrs. Howser's father, testified that he is a pastor of a church and a bonding agent. He said that Mrs. Howser called him on May 14, 2017, and asked him to pick her up. Mr. Wallace testified that Mrs. Howser was "crying and very terrified" on the phone. She said that she had left Defendant and was at a neighbor's house. Mr. Wallace said that Mrs. Howser "come right straight out and got in the car and said - - she was very disturbed and really crying and said, [']Let's get out of here quick. Quick. Let's get out of here.[']" Mrs. Howser was also afraid that Defendant would follow them. Mr. Wallace testified that Defendant did follow them until they arrived at the Sumner County Sheriff's Office. He said that Mrs. Howser filed a report with the deputies and then rode to his house to stay with Mr. Wallace. Mr. Wallace testified that he noticed red marks on the victim's shoulders. Mrs. Howser told him that Defendant pulled her hair and grabbed and held her.

Mr. Wallace recalled a previous occasion that Mrs. Howser called when she and Defendant were having trouble. He and his wife drove to the residence and spoke with Defendant and Mrs. Howser. He said that Defendant was very jealous and did not want the victim "seeing anybody or talking to anybody or going to - - you know, couldn't even trust her in any way to even talk with anybody on the phone." Defendant also indicated that "he was her husband and she was his wife and she was supposed to do what he wanted her to do." Mr. Wallace testified that Defendant did not want Mr. Wallace and his wife involved in his business so they left. The next week, Mrs. Howser called Mr.

Wallace to come and get her, and she stayed at his house for a couple of days. Mr. Wallace testified: "But each time she would come to the house he would call her and convince her that she was his wife and she needed to be back home and she - - that was her place."

Mr. Wallace testified that he seldom talked with Mrs. Howser by phone because Defendant did not want her talking to Mr. Wallace. He noted that Defendant would monitor Mrs. Howser's phone calls and text messages. He had also heard Defendant in the background during a phone call telling Mrs. Howser what to say. Mr. Wallace also suspected that Defendant answered Mrs. Howser's text messages.

Upon examination by the trial court, Mr. Wallace testified that there had been two incidents since May 14, 2017, in which Mrs. Howser called him and said that she was coming to his house. He testified:

> On those incidents she called said, Dad, I'm coming home and she brought her personal stuff and came to the house, stayed with us awhile and then [Defendant], of course, called her and talked to her and got her to come back.
>
> And then another time just recently she left and she said, Dad, it's over this time, that I am through. And I even helped her change all of her passwords on her phone and she changed her checking account, everything, and I thought it was really that this was the time that it was - - she was finished.

Mr. Wallace testified that the last incident occurred approximately eight weeks before the sentencing hearing. He said that Mrs. Howser had told him that "she's fearful for her life." He testified that six to eight weeks earlier, Mrs. Howser gave him her "last will and testament and told [him] to put it up." Mrs. Howser also told Mr. Wallace that she thought about suicide.

Deputy Frank Winslow of the Sumner County Sheriff's Department testified that a week or two after Defendant's case went to the grand jury, he called Mrs. Howser's cell phone to ask a couple of questions. Defendant answered her phone and wanted to know why Deputy Winslow was calling Mrs. Howser. After talking to Deputy Winslow several minutes, Defendant gave the phone to Mrs. Howser.

**Defendant's Proof**

Billy Clay Moore, Defendant's manager at Cash Saver, testified that he has known Defendant for twelve years. He said that Defendant is a good employee who comes to work on time and that Defendant had experience "running the meat department[.]" Mr.

Moore further testified that Defendant "goes above and beyond what I ask him to do, because obviously he has experience doing what I'm doing as far as running the market." He had not seen any evidence of drug or alcohol abuse by Defendant.

Windy Hinton testified that Defendant is her half-brother, and her husband is the pastor of a church in Bowling Green, Kentucky that Defendant attends. She said that Defendant "stayed in trouble" when he was younger and had to "raise himself[.]" Mrs. Hinton noticed a difference in Defendant after he went through drug court, and she noted that Defendant regained custody of his son after his son was placed in foster care. She said that Defendant was stable and "staying off drugs[.]" Mrs. Hinton testified that she now sees Defendant two to three times a week at church. She said that Defendant is at church every time the doors are open unless he has to work. Mrs. Hinton testified that Defendant was baptized, and Mrs. Howser also attends church with Defendant and his son, and they are active in the church. Mrs. Hinton noted that in the last five or six months Defendant was "doing better than I've ever seen him do." She agreed that if Defendant were to be placed on probation, he could do everything required of him.

Kevin Hinton, Defendant's brother-in-law, testified that Defendant, Mrs. Howser, and Defendant's son attend church where he is the pastor. He said that Defendant attends church regularly and participates. Mr. Hinton has noticed in the last several months that Defendant appears happy and fulfilled. When asked if Defendant and Mrs. Howser seem to get along, Mr. Hinton testified: "Yes, sir, I believe they do get along most of the time. I think any couple is going to have a cross word, but I've never saw them at church or never saw any kind of problem or, you know, anything like that." Mr. Hinton testified that other church members think a lot of Defendant and his family, and he felt that Defendant was an honest person. He felt that if Defendant were to be placed on probation he could do everything required of him. Mr. Hinton noted that he observed Defendant going through drug court and that Defendant did the things required of him.

On cross-examination, when asked if he knew that Defendant pled guilty to aggravated assault, reckless endangerment with a deadly weapon, and felon in possession of a weapon, Mr. Hinton testified:

> I knew nothing of any of this until just a few months ago - - or no, it
> hasn't been - - yeah, I guess it has. Maybe three months ago was when I
> was really made aware of it because my wife wasn't aware of it. And I
> think [Defendant] had shared that he was going to have to be going back
> to court, and she asked him why and, of course, he began to share about
> the night he made this mistake. And he said, I messed up, and I'm going
> to have to go back to court[.]

Mr. Hinton was not aware of the specific charges against Defendant until the sentencing hearing.

Tracye Bryant is the director of the Recovery Court Program in Sumner County. She said that Defendant was referred to drug court in 2012 and did "exceptionally well." Ms. Bryant further testified:

> He came into the program and we sent him to treatment on October 16, 2012, at Serenity in Memphis, Tennessee. He completed that program and returned here to go reside in a halfway house in Madison called Recovery Community, and he exceeded there with a sponsor and AA, and he did everything there that he was asked to do as - - but you can be there and work and go through the motions but not really get attached to recovery, but [Defendant] went above and beyond and got attached in recovery and was working a really good recovery program.
>
> He did so well that the owner of that program helped him get into Urban Housing Solutions, which are apartments for people who have addiction problems so that when you move into those apartments you are still drug tested. So you're still held accountable for your recovery. And so he got into those apartments, and he then started the process of getting custody of his son back and did get custody back and moved him there with him. And while he was there - - he'd had the same job the whole time he was there working as a butcher there in Madison.
>
> And then once he got his son back, he decided to move back to Sumner County, and I'm not certain - - I think maybe it was for the school systems, but then he met a lady that he married in 2016, and then he reported on a monthly basis after that. Once he graduated the program, he reported monthly.

Ms. Bryant testified that toward the end of Defendant's monthly supervision, a few months before his graduation from the program, Defendant had a positive alcohol test. Defendant came in, and they "discussed that and how [she] felt like he was more focused on work and not his recovery." Ms. Bryant testified that Defendant was working too much and needed to get "back to his meetings and being attached to recovery." She also thought that Defendant "got too comfortable and thought that he had the disease beat and that maybe he - - he was married and he had a home and was providing a good life, it seemed, for his family and just started not taking care of his recovery."

Ms. Bryant testified that she spoke with Defendant a couple of months ago, and he told her that he had "started going back to his meetings and doing the things he was supposed to treat his disease, and we talked about that, and I strongly encouraged him to keep that up and to never slack off of that again because he was going to have to always treat his disease."

On cross-examination, Ms. Bryant testified that Defendant graduated from drug court in 2013. She noted that Defendant reported to her by phone and email when he moved out of Sumner County. Ms. Bryant testified that she contacted Defendant after he moved back to Sumner County to get him to start reporting back to her because he missed some appointments. She did not drug test Defendant during the time that he stopped reporting.

Defendant submitted a letter from a clinical administrative assistant at Mending Hearts, Inc., a treatment center, which indicated that Defendant should receive counseling, meetings, and service work rather than time in prison.

Defendant testified that he has full custody of J.H., and he does not receive any child support from the child's mother. He said that his life was very unstable before drug court, and he "did a lot of drugs" and "a lot of bad things." Defendant testified that he had "done just about everything, you know, alcohol, opiates, marijuana, cocaine, everything, and I regret that." He said that after drug court he is now a "changed man" and that God had showed him how to live a productive life and be a good father and husband. Defendant testified that he and Mrs. Howser have "had some trying times" and that they both came from "some toxic relationships" and that they "had no clue how to be married at all." He further testified that "a lot of things that's been said here today has been twisted and turned to where it's showing that since we've been back in church to where it's - - looks like we're in the same behavior, and that's just not the case at all."

Defendant admitted that he was drinking on the night of the present offenses and that he made the wrong choice. However, he pled guilty and accepted full responsibility for his actions. Defendant agreed that he and Mrs. Howser have had arguments after the one in the present case, as testified to by Mr. Wallace. Defendant said that on one occasion Mrs. Howser received a letter from an inmate, and he had a "problem with it just like I expect anybody would." He said that Mrs. Howser thought that it would be a good idea for her to leave. Defendant testified that there were no threats or violence and that he was "pretty sure she thought that I was going to not want to be together anymore because of this, but after some - - and I think it was a good decision that she did leave, you know, so we could have some time apart and think about [it]." Defendant thought that the argument occurred four or five months before the sentencing hearing rather than eight weeks earlier as testified to by Mr. Wallace.

Defendant testified that Mrs. Howser left a second time because they were trying to stop smoking and "were both on the edge really bad[.]" He said:

> But she wanted to leave. I think mainly she wanted to go get a cigarette, to be honest with you, and I was, you know - - I knew that we were - - that was keeping us from being close to God. I knew God wanted to get

- 11 -

- - wanted to draw closer to us and have us draw closer to him, and I knew that was the only thing that was keeping us from getting close was cigarettes, smoking cigarettes. And so, I mean, I don't really know the details about it.

Defendant said that there was no big argument or any threats. He thought that Mrs. Howser was gone for "maybe a night or two."

Defendant testified that he had gotten back in touch with his sponsor and was attending AA and NA meetings. He and Mrs. Howser had done some counseling with their pastor, and they were also attending church regularly. Defendant testified that he understood that he would need to work on his disease the rest of his life. He said:

When I moved back, I just stopped recovery, you know, and I focused a lot - - I took on a job as a meat manager on two different occasions, and I was pulling 65, 70 hours a week and - - with no help, and it was really stressful. That's no excuse, but I just let it fall from me, you know, and so I really consider myself in a relapse the whole time.

Defendant testified that he had not used drugs or drank beer since the incident in May of 2017. He said that he stopped and purchased a twelve pack of beer after the last time that Mrs. Howser left. Defendant testified that he went home and took a sip out of one but stopped when his son walked into the room and asked why he was drinking again. Defendant said that he poured the remainder of the beer in the sink.

Defendant agreed that Deputy Winslow called Mrs. Howser's phone shortly after there was an order of protection put into place. He said that the call was placed after midnight. Defendant testified:

And he had called, and I can't remember exactly what was said, but he asked me if I was at the house and I said, yeah, and then he got off the phone pretty quick and we ended the conversation.

And then I was just laying there and I was wondering why he was calling so late, you know. So I called him back and asked him why he was calling at 12:30 at night. And I figured that the DA would be the one to call to ask any kind of questions. And then he asked to speak to my wife and he asked something about the gun.

Defendant said that the order of protection against him was later modified to no violent contact. He said that Officer Winslow thought that his being at the house violated the order of protection but he advised Officer Winslow that the order of protection had been "dropped."

On cross-examination, Defendant agreed that he violated the conditions of his bond by purchasing the twelve pack of beer. Defendant testified that he graduated from drug court in May of 2013, and it changed his life. He met Mrs. Howser in December 2014, and at some point after that punched her in the jaw because she came home late. His son was present at the time. Defendant admitted that he was very controlling of Mrs. Howser, and he said that they both had insecurities. He agreed that he got angrier and angrier with her, and he admitted that he probably called her some terrible names. Defendant agreed that he had broken his wife emotionally in the past. He thought that Mrs. Howser gave a copy of her will to Mr. Wallace because of an incident where she lost custody of her children, and that was also the reason that she contemplated suicide.

Defendant testified that if placed on probation, he would continue to attend meetings and be involved in recovery. He admitted that he had been drinking at the time of the present offenses and that he obtained a weapon from the house. He acknowledged he was not supposed to be around guns because he was a convicted felon.

Upon questioning by the trial court, Defendant agreed that he was still very unstable if he did not have recovery and God in his life. Defendant thought that he drank on at least four or five occasions from the time that he graduated from drug court until he was arrested in May 2017. He said that he had "no recovery at all going on at the time[.]" Defendant agreed that he had a total of thirteen misdemeanor convictions, including several DUI convictions, and seven felony convictions, including burglary and three counts of aggravated assault. He admitted that he had previously violated his probation.

Mrs. Howser was recalled as a witness to testify about the two incidents that occurred with Defendant before the sentencing hearing. She said that on one occasion, she and Defendant were arguing about a letter, and she decided that it would be best to go to her parent's house. Mrs. Howser testified that Defendant was not drinking, and he did not threaten her. The second incident occurred because she and Defendant were trying to stop smoking, and they had been arguing. Mrs. Howser testified that she again decided to go to her parent's house. She said that Defendant did not threaten her, and he was not drinking. Mrs. Howser also testified that she had not seen Defendant drink or use drugs since May 2017.

Mrs. Howser testified that she gave Mr. Wallace a copy of her will the first time that she went back home. She said that it was in reference to her other children because they were "going through some court proceedings[.]" On cross-examination, Mrs. Howser testified that she contemplated suicide before she and Defendant got together in March 2015 after she lost custody of her children. She thought that Mr. Wallace was off in his timeline of events by a couple of years. Mrs. Howser agreed that she heard Defendant's testimony concerning those events. She testified that Defendant was jealous

- 13 -

over the letter that she received, and he got upset with her, and she felt that he blamed her.

*Analysis*

Defendant contends that the trial court erred in ordering him to serve his sentence in confinement. The State responds that the trial court did not abuse its discretion in ordering Defendant to serve his sentence in confinement. We agree with the State.

The trial court has broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. In *State v. Caudle*, our Supreme Court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the 2005 amendments to the Sentencing Act, trial courts are to consider the following factors when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and
> (8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court must state on the record the factors it considered and the reasons for the ordered sentence. *Id.* § 40-35-210(e); *Bise*, 380 S.W.3d at 706. "Mere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6)(A). However, no criminal defendant is automatically entitled to probation as a matter of law. *State v. Davis*, 940 S.W.2d 558, 559 (Tenn. 1997). Instead, the defendant bears the burden of proving his or her suitability for alternative sentencing options. *Carter*, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b)).

When imposing a sentence of full confinement, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1)(A)-(C). In addition, the sentence imposed should be (1) "no greater than that deserved for the offense committed," and (2) "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4).

As a Range II multiple offender convicted of two Class C felonies and one Class E felony, Defendant in this case was eligible for alternative sentencing, but he was not considered a favorable candidate for alternative sentencing options. *See id.* § 40-35-102(6). In this case, the trial court made the following extensive findings concerning alternative sentencing:

> And then going to the statute that I asked everybody to look at here in going through these principles, 40-35-103. First of all, sentences

involving confinement should be based on whether confinement, number one, is necessary to protect society by restraining a defendant who has a long history of criminal conduct.

I want you to understand that I've got to watch letting emotions taint or affect my interpretation of the law, and I don't know if I necessarily agree about [defense counsel's] assessment of confinement is necessary to protect society. I think in this particular case we've got to look at more than what he's done since he committed this crime, and I'm not thoroughly convinced that his wife is still not in some kind of danger from his activities based on the testimony today.

But considering the whole thing, protecting society by restraining a defendant who has a long history of criminal conduct, we're not dealing with a defendant who's committed a crime in May of 2017 and looking what to do. We have a long history of criminal conduct, and I've covered much of this, but I'm going to cover it for the record.

In September of 2000, domestic assault was reduced to assault, and he got probation. Then a couple of months later, false report on an accident. He lied to the police about who was driving. And then in - - the next year, May of 2001, conviction for theft under $500, and he doesn't even remember what he did, but he got probation again. And then within a year he picks up a DUI and it's reduced to driving while impaired, and it's - - also gets convicted of driving on a suspended license.

Now, look at what we have done here for first offenders and somebody in the defendant's situation. We put him on probation. We've set up programs for him. We've done what needed to be done in those particular situations. Nobody asked that he go to the penitentiary for 10 years then.

And then he gets picked up for - - or arrested for failure to stop at the scene of an accident. He doesn't remember that. He gets picked up for another assault, another probation, and then also a domestic assault that's reduced to assault, another probation. And then we get a period of time here where he picks up three felonies, aggravated assault, 9/5/2003 and 8/26/2004. He gets probation again.

I sometimes begin to wonder if - - and, you know, the defendant has that frame of mind that must be dealt with. On the phone he said, I'll just get probation again. It's very frustrating being on this Court to see the

number of probation violations we get every week, and it's not a result of lack of programs or being merciful. It's a result of people being so selfish that they just want to do what's right in their own eyes all the time and they're not accountable and there are no serious consequences, and that's the society that we live in.

It seems that society no longer expects serious consequences for illegal behavior. You know, the punishment aspect of criminal law seems to have been replaced by excuses, blaming things, explaining behavior, minimizing, and saying, I'm good now. Focus has shifted from the criminal act and circumstances surrounding the act. And, you know, no wonder why some people think and are alarmed at the increase in crimes and the fact that some people are not deterred. So what are we doing? What are we doing to deter criminal activity?

Well, this defendant, convicted of three felonies for aggravated assault in 2003, 2004, and he picks up three probation violations and another DUI and a domestic assault, and he serves a whopping one year in jail. Wow. That's tough. It really helped him, really, really, helped him, all that probation, all those programs, really did well.

. . .

We still have criminal conduct in the fact that we've got reckless endangerment, we've got aggravated assault, possession of weapon [sic] as a convicted felon. Now, there can be absolutely no excuse for possessing a weapon as a convicted felon. That shows complete disregard for the law. I don't understand it, absolutely don't understand it, but there are times in people's lives where you put self above everything else, and that's not necessarily a drug court, a mental health court, or a government problem. It's a problem about humanity and making right choices and right and wrong.

Now, number two, confinement is necessary to avoid depreciating the seriousness of the offense and particularly suited to provide and effect [sic] deterrent to others likely to commit a similar offense. The deterrent effect on domestic abuse is staggering, and I don't know if it could ever be accurately measured.

I see Mrs. Howser today, and I see signs that you don't see in other people. Standing by you, [Defendant], I'm not certain she is revealing things that she doesn't think you want her to reveal. I'm not too comfortable with her credibility on a lot of issues. And I understand the dynamics of domestic abuse and your attorney mentioned that that frequently happens.

- 17 -

But I'm convinced as much as anything else that what she said in her statement to the police on 5/15/17 is true and accurate and straight from her heart. And this goes to appreciating the seriousness of the offense, and it goes to providing an effective deterrence.

She wrote (as read): "[Defendant] had continued for several months being controlling, mentally abusive, threats, and his rage/anger had escalated until this last week." That's all control with you, [Defendant].

(As read): "He wants to know where I'm going every minute, requesting pictures of my time clock while working. Last week while visiting his dad in the hospital he kept sending text messages and his rage and anger increased. He told me to leave and get away from his family. He sent texts stating, I can't stand you. I hate you, you effing, lying "B." I was scared to go home and called my dad."

And [Defendant], nobody needs to be called that. I don't care whether you've been through drug court or not. Nobody needs to be called those names, much less your own wife.

She said she was scared to go home and called her dad for help. (As read): "And [Defendant] convinced me to return home after meeting with my dad." And that's frequently done in this type of environment.

(As read): "Once I arrived home [Defendant] stated to never tell my parents anything that ever happens between us again. He made me call my dad and have it on the speakerphone, telling him that I was a liar and that he was in charge of the household. All this week [Defendant] continued to change his behavior back and forth and telling me I'm a fake Christian and he hates a liar."

And then she goes on to what happened on May 15th - - or - - yeah, May 15th of '17, May 2017. (As read): "Today [Defendant] came to my work and he continued to argue with me, stating I was a liar and our marriage was not worth saving because I continued with lies."

You've got angerness [sic], sir, and you've got bitterness, along with drug issues, and that's something that I'm scared about.

It goes on to say (as read): "Tonight once we arrived home, [Defendant] came home with alcohol and his anger increased," the nightmare of

- 18 -

anybody that's ever been through any emotional abuse. This abuse will never leave her mind.

(As read): "[J.H.] and I were playing ball. [Defendant] and [J.H.] played and he brought the gun outside, the .380, and he came over to me and said unlock - - uncock the gun, and I said, what? He was looking at it and he shot it up in the air and said never mind."

But I think she's wrong there. It's shot into the ground.

(As read): "Then he sat down and laid it on the tractor step beside where he was sitting and also took my keys so I couldn't go anywhere. He continued with remarks about me and he would increase in anger and then be calm."

Completely unstable.

. . .

Is that the way we treat human beings, sir, our own wives? And this isn't your first time around. You've assaulted another wife. You've assaulted a family member. You've assaulted your neighbor. You've been to drug court.

. . .

Typical, typical, total domestic abuser mentality.

Now, what else? One time before Mr. Wallace stated that she went to her - - to Mr. Wallace's house complaining she was supposed to do what he wanted, he didn't trust her. They got together and went over to the house. They talked. She asked the defendant to talk about things and bring things up, and he didn't want to do it. He's following his own selfish ways, the mind of a domestic abuser in a home that is really unsafe to live in.

. . .

So this is pretty serious, a pretty serious crime when you look at the circumstances. We're not talking about a guy that gets mad all of a sudden, loses control, hits his wife, and is sorry. This is about as serious as it gets because you took a gun and you're a convicted felon and you shot it, among other things. You threatened her while your son was sitting right there. I don't understand it.

Now, how are you going to deter this kind of activity? How are we going to deter others likely to commit similar offenses? What kind of punishment needs to be ordered to show that there should be no violence in the home and it's uncalled for? A man shouldn't hit his wife ever.

And what about more than one time? What about more than two times? What about more than three times or even more? What are we to do under the rule of law in court through cases to deter others? And there's a big deterrent effect here, huge, off the charts.

. . .

Three, measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. I've never seen - - I've never seen anything - - any system that has bent over backwards as much as it has bent over backwards to try to help you through issues. As my best count you've been on probation at least 12 times. You picked up five to seven probation violations. You've been to drug court.

. . .

Government cannot force people to live responsibly, [Defendant], but it can penalize those that don't, and it's about time. I deny you probation in this case. I think the only option for this Court in reading the law, in applying the law, in looking at every circumstance, you will go to the department of correction on those sentences.

The trial court considered the facts of this case and the appropriate sentencing principles. From the lengthy and detailed findings of fact the trial court denied Defendant's request for an alternative sentence based upon (1) the need to protect society by restraining a defendant who has a long history of criminal conduct, (2) the need to avoid depreciating the seriousness of the offense and provide an effective deterrent, and (3) measures less restrictive than confinement have frequently or recently been applied unsuccessfully to Defendant. *See id.* § 40-35-103(1)(A)-(C). A trial court may deny alternative sentencing if it finds that any one of the factors found at T.C.A. § 40-35-103 apply. *State v. Christopher Allen*, No. W2016-00505-CCA-R3-CD, 2017 WL 764552, at *4 (Tenn. Crim. App. Feb. 24, 2017); *State v. John Anthony Garrett*, No. E2012-01898-CCA-R3-CD, 2013 WL 5373156, at *4 (Tenn. Crim. App. Sept. 23, 2013). Accordingly, the trial court did not abuse its discretion in ordering Defendant to serve his sentence in confinement.

## CONCLUSION

The trial court did not abuse its discretion when it denied Defendant's request for an alternative sentence. Accordingly, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE